IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:15-CR-9-9H

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| | ) | |
| ANTONIO TILLMON, | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motions to dismiss. [D.E. #458 and #463]. Responses and replies have been filed, and this matter is ripe for adjudication.

## BACKGROUND

The court finds the following facts for the limited purpose of disposing Tillmon's instant motions. These findings are not dispositive for decisions as to any other defendant or for future decisions related to Tillmon. To the extent Tillmon alleges material facts are in dispute, the court disagrees and finds any factual dispute legally insignificant in light of the question presented before the court concerning the government's alleged outrageous conduct.

The Federal Bureau of Investigation ("FBI") and the United States Attorney's Office for the Eastern District of North Carolina initiated an investigation in 2013 in response to

allegations of systemic corruption within the Northampton County Sheriff's Office ("NCSO"). During the course of the investigation, FBI undercover employees ("UCEs") posed as members of a drug trafficking organization ("DTO") that purported to transport narcotics and narcotics proceeds between Miami and New York. Defendant, Antonio Tillmon, along with his co-defendants[1], allegedly believed the DTO had recruited law enforcement officers in every state, from Florida to New York, to protect the DTO's transport operations.

Tillmon, along with his co-defendants, assisted in the transport of purported cocaine and heroin, sometimes while armed, in exchange for cash payments. Defendants understood they were recruited to work for the DTO because of their status as law enforcement officers and expertise acquired in that capacity. The investigation consisted of multiple "operations" that typically involved the defendants transporting what they believed to be kilogram quantities of narcotics, or narcotics proceeds, in exchange for payment from the DTO. Contrary to defendants' understanding, no actual drugs were involved in the operations. In total, fifteen defendants joined the undercover operation, 14 of whom except Tillmon have pleaded guilty to some counts of the indictment. Tillmon has not yet been arraigned.

---

[1] Fourteen other individuals were charged in this case. The term "defendants" when used herein shall collectively refer to all fifteen defendants.

The operations began in August 2013, when, during conversations with a UCE, defendant Lann Tjuan Clanton, the first to join the DTO, agreed to conduct an armed robbery of cash proceeds from what was purported to be a drug dealer. On August 22, 2013, Clanton entered a hotel room under the ruse of still being a police officer, with a firearm, and robbed an individual he believed to be a drug courier. A second operation was conducted on September 26, 2013, when Clanton transported 10 kilograms of purported drugs from Dillon, South Carolina, to Emporia, Virginia. Following the second operation, Clanton recruited defendant Ikeisha Jacobs, who was employed as a deputy sheriff with the Northampton County Sheriff's Office. After meeting with UCEs, Jacobs agreed to make drug runs, and did in fact make drug runs, for the DTO.

The investigation was premised upon the DTO's desire to recruit law enforcement in North Carolina to protect the DTO's drug transport operations in North Carolina. Thus, Clanton and Jacobs were encouraged by the UCEs to recruit other law enforcement officers who would be willing to protect the transport of drugs and drug proceeds in exchange for payment. Clanton and Jacobs were soon assigned by the DTO to lead their own operational teams – teams that would eventually be comprised of other defendants they recruited to join the DTO. Importantly, neither Clanton nor Jacobs knew they were working for government

3

agents as they attempted to recruit other law enforcement officials to join the DTO.

Tillmon joined the conspiracy as a member of the Jacobs team following his recruitment by Jacobs in July 2014. At the time, Tillmon was employed as a police officer with the Windsor Police Department. In total, Tillmon is alleged to have participated in three operations. On August 7, 2014, Jacobs provided a UCE with the names of several individuals, including Tillmon, who Jacobs said would participate in the next DTO operation. On the evening of August 19, 2014, UCEs "John" and "Lisa" met with Tillmon and other members of Jacobs' team at a Ruby Tuesday restaurant to discuss an operation planned for the following day involving the transportation of 10 kilograms of purported heroin. During dinner, UCE John advised the next day's operation would "be an easy one" and "the product [would] all be secreted in the bottom [of] a fake gas tank." The UCEs provided the team with a ruse to use in the event they were stopped by law enforcement during the trip, explaining there would be a fake bill of sale in the car reflecting the car had been purchased in Georgia.

UCE Lisa cautioned the team saying, "the way this business came up, it happened so fast." Thus, if anyone tried to "rip it" then "it was an inside job... somebody talked" and team should "just let them have it." UCE John continued, "if some little

4

thug comes up to the car and tries to rip it off, make sure he sees your gun so he knows it's not a good idea." Before the dinner ended, UCE Lisa told everyone at the table that if they didn't want to help, "no problem," but asked that they "just keep it between us."

On the morning of August 20, 2014, an FBI aircraft delivered a black roller bag containing 10 kilograms of purported heroin to the Northampton-Halifax Regional Airport. According to plan, several UCEs and a team led by Clanton received the purported heroin at the airport. After Clanton and one of the UCEs counted the individually packaged kilograms of purported heroin, Clanton's team drove the package to a warehouse in Rocky Mount, North Carolina. Later that morning, Tillmon and other members of Jacobs' team arrived at the warehouse as directed. Tillmon and other team members gathered behind the designated "load vehicle," a white GMC Acadia, and watched as one of the UCEs removed the purported heroin from a cooler and secured it in a hidden compartment under the vehicle. During this time, UCE Lisa explained to the group, "when it's coming from the South, we're gonna have it in some kind of cooler." Referring to the cooler of purported heroin, UCE Lisa added there should be "ten in there."

Once the GMC Acadia was loaded, defendants left the warehouse and drove to National Harbor, Maryland. Tillmon

5

escorted the load vehicle in a separate car that served as a tail car for the vehicle containing the purported heroin. After delivering the purported heroin to National Harbor, Tillmon and other members of Jacobs' team entered a gondola at the Capital Wheel Ferris wheel where they each received cash payments.

Later in the fall, on October 22, 2014, Tillmon participated in another operation involving the transport of 10 kilograms of purported heroin from the same warehouse in Rocky Mount to Oxon Hill, Maryland. Tillmon and other members of Jacobs' team arrived at the warehouse in Rocky Mount where they were greeted by FBI UCEs. UCE Lisa told Tillmon and the others the operation was going to be the "same type thing" and the same exit, a reference to how the previous drug transport operation was conducted. A white GMC Acadia, which was an FBI vehicle, served as the load vehicle for the packages of heroin. UCE John took out a fake bill of sale from the GMC Acadia and showed it to the defendants. He told them that, in the event they were pulled over, the phone number on the fake bill of sale was his, and he would verify that the defendants were transporting a car for him. Shortly after the defendants arrived at the warehouse, UCE Paul drove into the warehouse in a Dodge Intrepid. This vehicle contained the 10 kilograms of purported heroin for transport.

Jacobs picked up the packages of purported heroin and walked them to UCE John by the GMC Acadia. With Tillmon and other members of Jacobs' team watching, UCE John took the packages and secured them in a hidden compartment under the load car, and then placed the spare tire back in the compartment. The three vehicles then traveled north to the Tanger Outlet Mall in Oxon Hill according to UCE Lisa's plan. Tillmon drove the load vehicle containing the purported drugs, and upon arrival, he and the others left the load vehicle in the mall parking lot, then drove to a McDonald's restaurant in National Harbor where they received their cash payments in the back seat of a UCE passenger van.

The next spring, on March 26, 2015, Tillmon allegedly participated in a third operation involving the transport of purported heroin. A team of defendants led by Clanton picked up a white Dodge Intrepid containing 20 kilograms of purported heroin in Lumberton, North Carolina, and drove it to the warehouse in Rocky Mount. Later the same day, a team including Tillmon assisted in loading half of the drugs (10 kilograms) into a GMC Acadia at the warehouse. Inside the warehouse, Tillmon and others were informed they were moving over a million dollars of heroin, and observed what they were told was cocaine being loaded into a different vehicle for transport. Tillmon confirmed to one of the UCEs he was in possession of a firearm

7

and also provided a firearm to co-defendant Alaina Sue-Kam-Ling for her to use during the operation. Tillmon and others then transported the purported drugs from the warehouse to National Harbor where a UCE paid Tillmon $2,500 for his work.

On April 30, 2015, Tillmon and others arrived at the warehouse in Rocky Mount intending to participate in an additional operation involving the transport of drugs for the DTO. Instead, defendants were arrested. Agents recovered 5 firearms, 12 magazines, and over 200 rounds of ammunition that Tillmon alone had brought to the operation. Almost all defendants, including Tillmon, provided an unprotected statement following their arrest. During Tillmon's interview, which lasted more than one hour and was recorded, Tillmon admitted he participated in the operations conducted on August 20, 2014, October 22, 2014, and March 26, 2015, and admitted to driving a vehicle during one of the operations. Tillmon, however, denied knowing he was transporting narcotics during the interview.

When asked who first introduced Tillmon to the FBI UCEs, he initially responded, "I'd rather not say right now" and that he would prefer to deal with his own part. Later in the interview, Tillmon admitted it was Jacobs who introduced him to the UCEs. Tillmon admitted he observed the UCEs loading goods into the car but denied knowing or being told what the goods were. Tillmon initially refused to disclose where he transported the "goods,"

8

but later admitted he took them to Maryland. To the question, "Did you ever consider that there might be some risk to this?" Tillmon responded, "Yeah, I did." Tillmon also admitted he witnessed UCEs under the vehicle with a dolly loading the goods. In describing this scene, Tillmon stated, "I suppose they hid it," but that he could not say for sure. Tillmon later acknowledged he believed storing the goods under the vehicle was odd but did not ask questions. Tillmon admitted he carried a gun during the operations and that he provided a gun to Sue-Kam-Ling during the operation on March 26, 2015. Tillmon further admitted he was paid around $2,000 for each operation.

An indictment was filed April 22, 2015, charging Tillmon in ten counts for his alleged participation in conspiracy, drug, firearm, and bribery offenses. Tillmon now moves to dismiss the indictment as to him on the basis of extreme and outrageous government conduct.

## COURT'S DISCUSSION

### I. Extreme and Outrageous Government Conduct

Tillmon moves this court to dismiss the indictment as to him because law enforcement conduct in the instant case was either unlawful or so outrageous as to violate fundamental notions of fairness in violation of his Fifth Amendment due process rights. In support of his argument, Tillmon relies on a legal theory first conceived by the Supreme Court in United

9

States v. Russell, 411 U.S. 423 (1973), and expounded upon in Hampton v. United States, 425 U.S. 484 (1976). Although rejecting application of such a theory in Russell, the Court observed it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction..." 411 U.S. at 431-32. The Supreme Court has never upheld a case alleging outrageous government conduct as the basis of a Due Process Clause violation. In fact, in Hampton, a plurality of the Supreme Court limited the doctrine to instances where the defendant can show a specific violation of a protected right. 425 U.S. at 490.

After Hampton, the Fourth Circuit has held that the "'outrageous conduct' doctrine survives in theory, but is highly circumscribed." United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013). A due process violation may be found only when the conduct at issue "is outrageous, not merely offensive." United States v. Goodwin, 854 F.2d 33, 37 (4th Cir. 1988). Thus, in order for the government conduct to offend due process, the conduct must be "shocking" or "offensive to traditional notions of fundamental fairness." Hasan, 718 F.3d at 343 (citing United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991)).

10

"Outrageous is not a label properly applied to conduct because it is a sting or reverse sting operation involving contraband." Goodwin, 854 F.2d at 37. Fourth Circuit jurisprudence contains "abundant and lenient appellate precedent concerning constitutionally permissible government conduct in undercover operations" and displays a "high shock threshold" in cases alleging outrageous government conduct. Osborne, 935 F.2d at 36-37. Like the Supreme Court, the Fourth Circuit has never held that the government violated a defendant's due process rights by engaging in outrageous conduct. See Hasan, 718 F.3d at 343.

With these general standards in mind, the reverse undercover operation at issue in this case is not sufficiently shocking or offensive to traditional notions of fundamental fairness as to offend due process. Here, the FBI created a drug trafficking operation in which it supplied sham drugs and directed defendants on where to transport those drugs. Tillmon was solicited to join the operation by Jacobs, who although recruited by government agents and asked to find other willing law enforcement officials to participate in the operation, did not know she was acting in concert with or at the direction of government agents when she recruited Tillmon.

Although Tillmon argues that he was not predisposed to criminal conduct and was the subject of an investigation which

11

violated guidelines established in an internal FBI operations manual, his argument is unavailing. The guidelines Tillmon refers to admit,

> They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable by law by any party in any matter, civil or criminal, nor do they place any limitations on otherwise lawful investigative or litigative prerogatives of the Department of Justice.

The Attorney General's Guideline on Federal Bureau of Investigation Undercover Operations, at 19, available at https://www.justice.gov/sites/default/files/ag/legacy/2013/09/24/undercover-fbi-operations.pdf.[2] Further, even if the government had no particularized basis to allow Tillmon to join the operation, as Tillmon claims, it did not violate Tillmon's constitutional rights by doing so, let alone in such a way that warrants dismissal of the indictment. See, e.g., United States v. Duckett, 88 F.Supp.3d 464 (2015); see also Osborne, 935 F.2d at 35 (The Fourth Circuit has rejected the notion "that constitutional norms are violated when, without reasoned grounds, officers approach apparently innocent individuals and provide them with a specific opportunity to engage in criminal conduct"). Detecting and apprehending criminal activity of law enforcement officials requires a significant degree of

---

[2] Notwithstanding the inability of the internal guidelines to establish a substantive or a procedural right enforceable by law, the court finds Tillmon fails to allege sufficient facts to show the government violated the internal guidelines by conducting the reverse sting investigation in the instant case.

12

sophistication and planning that may not otherwise be required to effectively police other types of criminal activity committed without the cover of a badge.³ The government's activity in the instant case, in conclusion, simply does not reach the high threshold required to be deemed outrageous and in violation of the Constitution.⁴

The court notes Tillmon also complains of other conduct that allegedly shocks the conscience or violates a substantial right but shows the court no authority in support of his claims. Claims in this category include Tillmon's objection to statements made by the media, testimony of a government witness at his and another co-defendant's detention hearings, the government's decision to request pretrial detention despite a release recommendation by the United States Probation Office, a choreographed escort composed of deputies of the United States Marshal bearing assault weapons that led Tillmon and his co-defendants into the courtroom for his detention hearing, and the government's charging decision. Although the court has

---

³ While not at issue here and distinct from any outrageous government conduct claim, Tillmon refers to a potential entrapment defense and his alleged lack of predisposition throughout his memoranda. The court notes, "in the Fourth Circuit, a defendant cannot claim an entrapment defense based upon the purported inducement of a third party who is not a government agent if the third party is not aware that he is dealing with a government agent." United States v. Squillacote, 221 F.3d 542, 574 (4th Cir. 2000).

⁴ Although Tillmon relies in part upon a Third Circuit case, United States v. Twigg, 588 F.2d 373 (3d Cir. 1978), as persuasive precedent in urging the court to deem the government's conduct sufficiently outrageous to offend due process, the Third Circuit has observed that their ruling in Twigg has been limited by the more recent Supreme Court decision in Hampton. See United States v. Beverly, 723 F.2d 11, 12-13 (3d Cir. 1983).

13

considered these allegations in its analysis of the totality of circumstances related to Tillmon's outrageous government conduct claim, the court finds Tillmon has failed to show any further or independent basis in law on which the court may dismiss the indictment. Therefore, finding the government conduct in this case does not shock the conscience, Tillmon's due process claim on that basis fails and is therefore denied.

## II. Fourth Amendment

Second, Tillmon moves for dismissal of the indictment as to him on the basis of the government's alleged violation of his Fourth Amendment rights. Tillmon argues the government did not have "suspicion and did not seek any judicial oversight" before soliciting Jacobs to recruit other law enforcement officials to join the operations. (Mot. to Dismiss on Add'l. Const. Grds., [D.E. # 463], at p.2)

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV; Mapp v. Ohio, 367 U.S. 642, 662 (1961) (Black, J., concurring). Notwithstanding the impropriety of the requested relief, dismissal instead of exclusion, Tillmon's claim fails because he does not complain of a specific unreasonable search or seizure. Even if the court, however, considered Tillmon's claim outside of the Fourth Amendment context, it still fails. Due process principles do not require the government to demonstrate it has reasonable

14

suspicion of a person's wrongdoing before initiating an undercover investigation. Osborne, 935 F.2d at 36. Therefore, Tillmon's claim based on an alleged violation of his Fourth Amendment rights is unpersuasive and is therefore denied.

### III. Conditions of Pretrial Confinement

Next, Tillmon argues his Eighth Amendment right to be free from cruel and unusual punishment was violated because of disproportionate mandatory minimum sentences to which he may be subject, "techniques used to place [him] is pretrial detention[,]" and his placement in "virtual solitary confinement" during some or all of his time in pretrial detention. Tillmon has not been convicted of any crime in the instant case nor has he been held in confinement subject to any sentence of punishment. Thus, Tillmon's claims based on a violation of his Eighth Amendment right to be free from cruel and unusual punishment are unseasonable. See Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).

In his reply, Tillmon asserts an additional basis for his claim concerning his "virtual solitary confinement" during pretrial detention rooted in the Due Process Clause. While Tillmon, as a pretrial detainee, enjoys due process rights established by the Fifth Amendment "at least as great as the [E]igth [A]mendment protections available to the convicted prisoner," see Martin v. Gentile, 849 F.2d 863, 870 (4th Cir.

15

1988), he has failed to allege sufficient facts showing how his pretrial detention has deprived him of due process.

Tillmon admits he was a law enforcement official and was, at least ostensibly, held in "virtual solitary confinement" for his protection. The Fourth Circuit, however, has stated, "...not every inconvenience encountered during pretrial detention amounts to 'punishment' in the constitutional sense." Id. (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)). To constitute an impermissible punishment in violation of a pretrial detainee's due process rights, the particular confinement condition must: (1) be "imposed with an expressed intent to punish[;]" or (2) not be "reasonably related to a legitimate nonpunitive governmental objective..." Id. Here, placement of Tillmon in "virtual solitary confinement" was not punitive; rather, it was reasonably related to a legitimate nonpunitive government objective, namely the protection of a charged law enforcement official from the general inmate population.[5] Therefore, Tillmon's due process claim fails and is therefore denied.

---

[5] The court notes it reopened the detention hearings in defendants' cases based on its concerns regarding due process, specifically access to counsel and discovery. However, its decision to release defendants pending trial was based on the totality of the circumstances, including access to counsel and discovery, the lack of a history of violence in many of the defendants' cases, and other factors. The court did not find a due process violation in the way defendants were being housed, but rather found that while the solitary confinement was reasonably related to safety and other concerns, pretrial confinement was unnecessary in these cases.

### IV. Ninth Amendment

Finally, Tillmon summarily argues the government conduct in the instant case intruded upon a penumbral "zone of privacy" consistent with protections afforded by the Ninth Amendment. See, e.g., Paul v. Davis, 424 U.S. 693, 712-13 (1976). Tillmon's conclusory allegation fails to show a basis for his requested relief.

### V. Denial of Hearing

The court rejects Tillmon's invitation to schedule a hearing in this matter. Supreme Court and Fourth Circuit precedents undermine the need to probe the government conduct in the instant case further. From a constitutional standpoint, the government agents themselves, without soliciting efforts from Jacobs, could have approached Tillmon "sight unseen and offered [him] the opportunity to participate in a [crime] without *any* particularized basis." See Duckett, 88 F.Supp.3d at 471 (applying legal principles established in Osborne) (emphasis in original). Tillmon's request for a hearing is therefore denied.

### CONCLUSION

For the foregoing reasons and for reasons more fully set forth in the government's responses and memoranda in opposition to Tillmon's motions, Tillmon's Motion to Dismiss, [D.E. #458], and Motion to Dismiss on Additional Constitutional Grounds, [D.E. #463], are DENIED.

17

Arraignment remains SCHEDULED in this matter for this court's **May 10, 2016, term of court.**

This __5 TH__ day of April 2016.

_____
MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC
#34